UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

     02 CR 482 (ARR)

     OPINION AND ORDER

    -against-

ANDREA RUSSO,

           Defendant.

-------------------------------------------------------------------- X

ROSS, United States District Judge:

Defendant Andrea Russo ("defendant" or "Russo") was indicted for the crime of illegal reentry following deportation, in violation of 8 U.S.C. § 1326(a), on April 22, 2002. By motion dated August 31, 2004, defendant moves to dismiss the indictment pursuant to 8 U.S.C. § 1326(d) by collaterally attacking his removal order on the basis of a fundamental procedural error in his April 1998 removal hearing. For the reasons stated below, the court denies defendant's motion to dismiss the indictment.

## BACKGROUND

Russo was born in Italy in 1958. He was admitted to the United States on February 6, 1966, shortly before his eighth birthday, as a lawful permanent resident ("LPR"). Russo never applied for naturalization to become a United States citizen. In 1975, Russo left school and joined the United States Army. Respondent's Ex. 2 at 40. He obtained a GED before joining. Id. at 43. After completing approximately forty-five days of basic training, Russo, according to his own description, had a "nervous breakdown" and received an honorable discharge. Id. at 40.

1

Shortly after turning eighteen years old, Russo pleaded guilty on June 1, 1977 to a charge of robbery in the second degree, for which he received a seven-year sentence. Respondent's Ex. 1 at 44. He had originally been charged with attempted murder, among other offenses. Id. at 32. He also pleaded guilty to one count of assault in the first degree on December 2, 1977, for which he received zero to twelve years' imprisonment. Id. at 46. He had originally been charged with attempted murder in the second degree, among other offenses. Id. at 32. On December 12, 1977, Russo pleaded guilty to another second degree robbery charge, receiving a sentence of up to four years' imprisonment. Id. at 45. Russo pleaded guilty to the latter two crimes while incarcerated pursuant to the first conviction. Respondent's Ex. 2 at 7. The three sentences were to run concurrently.

Russo was released to parole supervision on August 8, 1980. He married Maria Josephine Centurino, an LPR, in September 1980. On June 19, 1981, while on parole, defendant pleaded guilty to robbery in the first degree and, on July 17, 1981, he was sentenced to a term of imprisonment of eight and one-half to seventeen years. Respondent's Ex. 1 at 34. Russo, with a co-defendant, had robbed a construction company wearing ski masks. Id. at 21. Russo's co-defendant wielded a shotgun, striking a victim over the head with its barrel and firing a shot into the wall. Id. The two men made off with the employees' pay envelopes before being apprehended by the police. Russo served eight and one-half years of that sentence, with regular visits from his wife through a family reunion program, and his wife gave birth to two of his three children while he was incarcerated pursuant to that sentence. Respondent's Ex. 2 at 11. He was released from prison in 1989, at which point the Immigration and Nationality Service ("INS") commenced deportation proceedings against him on the basis of his criminal convictions.

At his deportation hearing, Russo applied for a section 212(c) waiver of deportation. At a June 19, 1991 hearing, the immigration judge ("IJ"), Robert D. Weisel, granted Russo's application. Respondent's Ex. 2. Considering the duration of Russo's lawful residency in the United States, his family ties, Russo's service in the armed forces, and the hardship Russo's family would suffer were he to be deported, the IJ concluded that Russo had "unusual and outstanding equities" in his favor. Id. at 106. The IJ also noted that Russo had taken steps toward rehabilitation while incarcerated and acknowledged that Russo was employed at the time of the hearing. Id. at 107.

After being granted section 212(c) relief in 1991, Russo was convicted of aggravated unlicensed operation of a motor vehicle in 1994. Respondent's Ex. 10. He subsequently pleaded guilty, on September 6, 1995, to criminal possession of stolen property in the third degree, an aggravated felony. Respondent's Ex. 3 at 79. Russo testified before this court that he failed to appear for sentencing and, after a bench warrant was issued, eventually surrendered himself, receiving a sentence of three to six years. Respondent's Ex. 3 at 81, 87; Hearing Transcript [hereinafter "Tr."] at 39.

The INS commenced deportation proceedings against Russo on the basis of the criminal possession conviction on March 12, 1998, while he was incarcerated. Respondent's Ex. 3 at 90-92. Russo appeared pro se for a removal hearing on April 30, 1998 before IJ Joseph Miller. Respondent's Ex. 4 at 1. After the IJ indicated that Russo had a right to appeal his decision and notified him of his right to retain an attorney, Russo asked whether he would be eligible for "expedited deportation" if he volunteered to leave the country. Id. at 2. The IJ explained that if Russo waived his right to have a lawyer and accepted a deportation order, he would be deported

as soon as the state released him from incarceration. Id. at 4. Russo thereafter waived his right to a lawyer. The IJ notified Russo that no relief was available to him. First, he indicated that the "new law," presumably the 1996 amendments to the Immigration and Nationality Act ("INA"), precluded an alien from receiving a second section 212(c) hearing after having been granted section 212(c) relief once. Id. at 8. Second, the IJ told Russo that the 1996 amendments eliminated section 212(c) relief for those convicted of an aggravated felony. Id. On these two bases, the IJ concluded that Russo was ineligible to be considered for relief as a matter of law. The IJ ordered Russo deported, and Russo waived his right to administrative appeal. Id. at 10. Russo was removed from the United States shortly thereafter.

Russo was involved in a motor vehicle accident in this country in June of 2001, which resulted in his arrest for unlicensed operation of a vehicle. Russo gave police an alias, and it was thereafter determined that Russo had reentered the country illegally after having been deported. Tr. at 43. While Russo apparently indicated, in an affidavit submitted to the INS, that he had reentered the country on June 21, 2001 with a visitor's visa, Respondent's Ex. 16 at 2, he testified that he had actually reentered the country via Mexico in March of 1999. Tr. at 43-45. The government indicted Russo for "illegal reentry," in violation of 8 U.S.C. § 1326(a), on April 22, 2002.

On June 10, 2003, Russo filed a motion to reopen his deportation proceeding before IJ Miller in order to seek relief under section 212(c), invoking the Supreme Court's decision in INS v. St. Cyr, 533 U.S. 289 (2001), and arguing that, because he had pleaded guilty to criminal possession prior to April 24, 1996, the elimination of section 212(c) relief did not apply retroactively to him. Respondent's Ex. 3 at 25. The IJ found that he was without jurisdiction to

4

consider Russo's motion, as Russo had already been deported, and the Board of Immigration Appeals ("BIA") upheld that ruling by order dated October 22, 2003. Id. at 23, 6.

By motion dated August 31, 2004, defendant seeks to dismiss the indictment by collaterally attacking his April 30, 1998 deportation order, which constitutes an element of the crime with which he is charged. The court held a "Copeland" hearing on March 24, 2005 in order to determine whether, had the IJ considered his application for section 212(c) relief in 1998, there is a reasonable probability that Russo would have been granted such relief. Russo testified on his own behalf, and respondent called a former IJ and member of the BIA, Lauren R. Mathon, to testify as an expert witness.[1]

## DISCUSSION

I.  Collateral Attacks on Deportation Orders in Illegal Reentry Prosecutions

An alien who, after being deported, enters, attempts to enter, or is found in the United States is guilty of the crime of "illegal reentry" in the absence of authorization from the Attorney General. 8 U.S.C. § 1326(a). After the Supreme Court's ruling in United States v. Mendoza-Lopez, 481 U.S. 828 (1987), Congress codified the conditions under which an alien charged with illegal reentry may defend against the prosecution by challenging the validity of the deportation order upon which the charge is predicated. This collateral attack provision was codified at 8 U.S.C. § 1326(d) and reads:

---

[1]Russo has challenged Mathon's qualification as an expert witness arguing, inter alia, that she had never previously been qualified as an expert concerning section 212(c) relief. It is likely, given the novelty of these proceedings, that few people have provided expert testimony in federal court regarding the adjudication of section 212(c) applications. The court notes that Judge Jack Weinstein recently accepted the expert testimony of a former IJ, also qualified as an expert in this field for the first time, in United States v. Copeland, No. 01 Cr. 1453 (JBW), 2005 WL 1109441 (E.D.N.Y. May 4, 2005).

(d) In a criminal proceeding [for illegal reentry], an alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that–

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

The United States Court of Appeals for the Second Circuit has issued several recent opinions addressing the requirements of section 1326(d) and has indicated that a defendant-alien must satisfy all three requirements in order to obtain dismissal of the indictment against him.

    A.    Exhaustion

In United States v. Sosa, 387 F.3d 131 (2d Cir. 2004), the Second Circuit held that "the [administrative] exhaustion requirement [of section 1326(d)(1)] must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." Id. at 136. The court went on to state that "[a] failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1), therefore, only where an alien's waiver of administrative review was knowing and intelligent." Id. The court held in Sosa that a waiver of administrative review is not knowing and intelligent, and therefore invalid, where the defendant-alien was not informed by the IJ at his deportation hearing of his right to apply for section 212(c) relief or was erroneously informed that he was ineligible for such relief. Id. at 137. The court thus clarified that the exhaustion requirement must be excused for any alien who pleaded guilty to a deportable offense before April 24, 1996, was denied consideration for section 212(c) relief following the enactment of the 1996 amendments to the INA, and waived administrative review after being told by an IJ that he was ineligible for such relief as a matter of law.

6

B.     Denial of the Opportunity for Judicial Review

Interpreting section 1326(d)(2), the Second Circuit has indicated that "judicial review" encompasses both direct appeal from a deportation order and judicial relief by way of habeas corpus. United States v. Copeland, 376 F.3d 61, 67-68 (2d Cir. 2004). The court stated that, where there was no statutory right to appeal a deportation order directly to a federal court, but habeas review was technically available, "judicial review will be deemed to have been denied if resort to a habeas proceeding was not realistically possible." Id. at 68 (emphasis added). The court specified that the opportunity for judicial review will be deemed to have been denied "where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition." Id. In United States v. Calderon, 391 F.3d 370 (2d Cir. 2004), the court elaborated on its analysis in Copeland, finding that a defendant-alien had satisfied the section 1326(d)(2) requirement "that he demonstrate that he was deprived of the opportunity for judicial review because, although he had habeas review available to him, (a) he was mistakenly advised by the IJ to the contrary, and (b) his speedy deportation further limited his ability to seek review." Id. at 376.

C.     Fundamental Unfairness

In Copeland, the court stated explicitly, with respect to section 1326(d)(3)'s "fundamental unfairness" requirement, that an IJ's "failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)." 376 F.3d at 71. Considering the special duties IJs have with respect to aliens, the court ruled that an IJ's statement misleading an alien into believing that no relief exists as a matter of law is fundamental procedural error. Id. The court went on to adopt the standard for

7

establishing prejudice that the Supreme Court had enunciated in Strickland v. Washington, 466 U.S. 668 (1984). Prejudice is established under that standard "where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief." 376 F.3d at 73. The Copeland court stated that the determination of prejudice in the section 1326(d)(3) context is "akin to a trial within a trial" requiring the district court to "obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." Id. at 73-74.

Specifically, the Second Circuit directed district courts, in cases involving collateral attacks on deportation orders, to hold a hearing much like the section 212(c) hearing the IJ should have held initially and to balance "'the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the bests interests of this country.'" Id. at 74 (quoting Matter of Marin, 16 I. & N. Dec. 581, 584 (BIA 1978)).[2] The Second Circuit has made clear that "what is at stake in the illegal reentry context is not the restoration of the defendant's deprived opportunity to apply for § 212(c) relief. Rather, in the

_____

[2]The BIA established in Marin the negative and positive factors to be considered in determining whether relief should be granted. Adverse factors include: the nature and circumstances of the exclusion ground at issue; the presence of additional immigration law violations; the existence of a criminal record and its nature, recency and seriousness; and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. 16 I. & N. Dec. 581, 584-85. Favorable considerations include: family ties within this country; residence of long duration in this country; arrival in the country at a young age; evidence of hardship to the alien and the alien's family upon deportation; Armed Forces service; employment history; community service; property or business ties; evidence attesting to good character; and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation. Id.

illegal reentry context, the defendant is asking the court to dismiss the indictment against him . . . ." Edwards v. INS, 393 F.3d 299, 311 (2d Cir. 2004). The court went on to state that "the courts must necessarily play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief." Id. The court has further clarified that, in determining whether the defendant-alien suffered prejudice as a result of the fundamental procedural error in the removal proceeding, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Scott, 394 F.3d 111, 118 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 694). In Scott, the court indicated that when considering whether a defendant in an illegal reentry prosecution suffered prejudice as a result of the IJ's error, the court must limit its consideration to the facts and equities as they existed at the time of the deportation proceeding when the procedural error occurred and may not consider "ex post data." Id. The court stated that, "in assessing whether the defendant-alien had a reasonable probability of not being deported at his proceeding . . ., the district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences." Id. at 119.

II.       Balancing the Equities under Section 212(c)

As noted above, the considerations, or equities, that IJs balance when considering an application for section 212(c) relief, are well established. Adverse factors include: (1) the nature and circumstances of the exclusion ground at issue; (2) other immigration law violations; (3) the alien's criminal record; and (4) evidence indicative of an alien's undesirability as a permanent resident. Favorable factors include: (1) family ties to the United States; (2) many years of residency in the United States; (3) hardship to the alien and his family upon deportation; (4)

9

United States military service; (5) employment history; (6) community service; (7) property or business ties; (8) evidence attesting to good character; and, in the case of a convicted criminal, (9) proof of genuine rehabilitation. Marin, 16 I. & N. Dec. at 584-85; Lovell v. INS, 52 F.3d 458, 461 (2d Cir. 1995).

Although, between 1989 and 1995, more than one-half of the applications filed for section 212(c) relief were granted, St. Cyr, 533 U.S. at 296 & n.5, an alien with a lengthy or violent criminal history faced a significant hurdle to demonstrate that his application merited favorable consideration. The BIA has indicated that aliens with lengthy criminal histories must "show that [they have] unusual or outstanding equities in this country." Matter of Burbano, 20 I. & N. Dec. 872, 875 (BIA 1994); Matter of C-V-T, 22 I. & N. Dec. 7, 11-12 (BIA 1998) ("[A]s the negative factors grow more serious, it becomes incumbent upon the alien to introduce additional offsetting favorable evidence, which in some cases may have to involve unusual or outstanding equities.") (collecting cases). Aliens convicted of "serious" crimes likewise bear the burden of establishing outstanding equities. Matter of Buscemi, 19 I. & N. Dec. 628, 633-34 (BIA 1988) (finding that an alien must demonstrate outstanding equities where convicted of a serious drug offense, such as trafficking or sale of drugs, a single serious crime, or a succession of criminal acts that together establish a pattern of serious criminal conduct). Outstanding equities include long-term lawful residence in the United States, United States citizen dependents and other family ties, a history of regular employment, and evidence of rehabilitation.[3] Matter of Catalina Arreguin de Rodriguez, 21 I. & N. Dec. 38, 41 (BIA 1995) (finding unusual or

---

[3]The court notes that, because of the limited number of published BIA decisions in this area, it refers to the Board's unpublished decisions, which lack precedential authority, as instructive in determining how IJs and the BIA adjudicated section 212(c) applications.

outstanding equities where alien had twenty years as a lawful United States resident and two United States citizen minor children and there was evidence of rehabilitation and regular employment); Matter of Urbina, No. A36 277 662, 2003 WL 23216763 (BIA Sept. 26, 2003) (finding outstanding equities where the alien had twenty-eight years lawful United States residence, lawful resident elderly parents, wife and children who were dependent on him, as well as a history of regular employment); Matter of Vongvixay, No. A23 882 967, 2003 WL 23216741, *1 (BIA Sept. 29, 2003) (finding outstanding equities where the alien exhibited signs of rehabilitation, had lived in the United States since he was seven years old, and had extensive family ties in the United States); Matter of Fuentes, A43 026 474, 2004 WL 1059687 (BIA Jan. 9, 2004) (finding outstanding equities where the alien showed signs of rehabilitation, had sixteen years of residence in the United States, and a superior employment record); Matter of Villapando-Nava, A92 482 208, 2004 WL 1398718 (BIA Apr. 14, 2004) (finding outstanding equities where the alien arrived in the United States as a minor, lived in the United States as a lawful resident for sixteen years, had extensive family ties in the country, and had a history of regular employment). Rehabilitation, in particular, is important. The BIA has held that an applicant for section 212(c) relief who has a criminal record ordinarily will be required to make a showing of rehabilitation before relief will be granted as a matter of discretion, but it explicitly has held that rehabilitation is not an absolute prerequisite to relief. Matter of Edwards, 20 I. & N. Dec. 191, 196 (BIA 1990). The BIA has noted on multiple occasions that a single negative factor, such as a serious criminal offense, could be determinative of whether an alien merits relief under section 212(c). Id. at 195.

It bears emphasis that the BIA has held that even a showing of outstanding equities did not compel a grant of discretionary section 212(c) relief to an alien with a serious or lengthy criminal history. Rather, without such equities, relief would not be granted as a matter of discretion. Id. Stated differently, demonstration of outstanding equities was a threshold requirement before these aliens could even be considered for relief.

When considering an application for section 212(c) relief, IJs could consider, with respect to issues of rehabilitation and discretion, convictions that preceded a previous waiver of deportation pursuant to section 212(c). Matter of Balderas, 20 I. & N. Dec. 389, 391 (BIA 1991) ("The prior convictions may [] be considered by the immigration judge in a new deportation hearing with respect to issues of rehabilitation and discretion."). The BIA made clear that "when section 212(c) relief is granted, the Attorney General does not issue a pardon or expungement of the conviction itself" and that "the crimes alleged to be grounds for excludability or deportability do not disappear from the alien's record for immigration purposes." Id. at 391. Thus, while an alien who has received a section 212(c) waiver with respect to one or more offenses may not be deported thereafter on the basis of those offenses, if the alien becomes deportable because of an additional crime, the prior convictions for which a waiver of deportation was granted may be considered, as noted, "with respect to issues of rehabilitation and discretion." Id.

III.    Merits of Defendant's Motion

As a preliminary matter, the court notes that its task, following Russo's Copeland hearing, is not to act as an IJ in order to determine how the court would have exercised its discretion in 1998, but rather, based on the equities as they existed at the time and the cases of similarly situated aliens, how a hypothetical, representative IJ would have ruled on Russo's

12

application in 1998. The court's role is to determine whether there is a reasonable probability

that this IJ, considering Russo's application for a section 212(c) waiver in light of the facts and

equities existing at the time, would have granted the application. While the Second Circuit has

admonished the district courts "to play the role of prognosticator," that role is made difficult by

the absence of published IJ decisions from which the court could seek guidance. Judge

Weinstein has noted that "[t]he request to take into account actual cases in the context of

decisions by immigration judges and the Board of Immigration Appeals poses a substantial

challenge" in light of the fact that so few decisions are published and accessible. United States v.

Copeland, No. 01 Cr. 1453 (JBW), 2005 WL 1109441, *28-29 (E.D.N.Y. May 4, 2005). Even

assuming, in the typical case, that the reported decisions of the BIA provide adequate guidance to

district courts, Russo's case is perhaps out of the ordinary. At the time of the agency error in his

case, Russo had already been granted one section 212(c) waiver. The BIA's reported cases

provide little guidance as to how Russo's application would have been analyzed in light of that

fact. The court has some indication, including the testimony of respondent's expert witness, that

a second grant of relief pursuant to section 212(c), while rare, was not an unheard-of occurrence

during the relevant period.[4] Tr. at 75-76. Acknowledging the limited to non-existent guidance

from "actual cases in which similarly situated aliens have been granted or denied discretionary

---

[4]Despite the paucity of reported decisions on this issue, the court is aware of one Ninth Circuit case in which a petitioner had received two section 212(c) waivers, although the circumstances of his offenses and the grants of relief were not indicated in the opinion. Molina-Amezcua v. INS, 6 F.3d 646 (9th Cir. 1993). The government would also have the court consider a declaration from an employee of the Executive Office for Immigration Review describing a statistical analysis purporting to show that approximately 12% of aliens who filed a second application for section 212(c) relief between October 1, 1991 and April 24, 1996, were granted relief a second time. Respondent's Ex. 14. The court references this study only insofar as it establishes that at least some aliens did receive two section 212(c) waivers.

relief," Copeland, 376 F.3d at 73-74, the court will proceed to balance the adverse factors with the favorable considerations to determine whether there is a reasonable probability that, had the IJ properly considered Russo's eligibility for section 212(c) relief in 1998, the IJ would have granted a waiver.

On the negative side of the ledger, the court first considers the exclusion ground at issue. Russo's 1998 deportation order was issued on the basis of his conviction of an aggravated felony, criminal possession of stolen property in the third degree, for his possession of a stolen automobile. Russo testified that he had made a $500 down-payment on the Lincoln Towncar, for which he planned to pay $3500, to someone he knew to be "less than reputable." Tr. at 19, 52. He planned to use the car in his employment as a driver with a taxi service so that, as an owner-operator, he could retain a greater percentage of the revenues he generated. Id. at 18. Russo pleaded guilty to that crime in 1995, and his plea agreement reportedly suggested an appropriate sentence to be a term of imprisonment from two to four years. In his testimony before this court, Russo acknowledged that he had, in effect, consciously avoided knowing whether the car he intended to purchase had been stolen and further acknowledged that the thought that the car may have been stolen had "crossed [his] mind." Id. at 57-58. While an aggravated felony, and thus a deportable offense, this conviction did not constitute a "serious" offense as generally understood in the section 212(c) context in that it did not involve drugs and was not a violent offense or one involving a weapon.[5]

---

[5]The court notes that, in United States v. Scott, the Second Circuit found that a defendant-alien had a reasonable probability of being granted section 212(c) relief notwithstanding a conviction for criminal possession of stolen property in the third degree. 394 F.3d 111. Unlike Russo, however, Scott was required to serve only six months of his three to six year sentence because he successfully completed the New York State Shock Incarceration Program. Id. at 113.

Russo had, however, committed several violent offenses involving firearms that were clearly "serious" for the purposes of section 212(c) relief. He had been convicted of four such offenses between 1977 and 1981. At the time of his deportation hearing in 1998, however, the most recent of these convictions had become attenuated by approximately seventeen years. While it is true that Russo had been incarcerated for much of this period, he had been released from custody for approximately six to seven years before being convicted on the criminal possession charge. In the intervening period, the only offense for which Russo was convicted was aggravated unlicensed operation of a motor vehicle. Russo's license had apparently been revoked for failure to pay traffic violation tickets. While perhaps constituting evidence of bad character, this offense does not weigh heavily against Russo. Significantly, the four violent offenses all pre-dated Russo's original section 212(c) waiver, granted in 1991. The IJ in that proceeding considered the gravity of Russo's criminal record against the "unusual and outstanding equities" in his favor and determined that Russo merited a waiver of deportation with respect to those offenses. While, pursuant to the BIA's decision in Balderas, 20 I. & N. Dec. at 391, the court recognizes that the IJ hearing Russo's application in 1998 would have considered these convictions when exercising her discretion whether to grant a waiver, the court finds that these convictions would not have received overwhelming weight as they had become, by that point, attenuated.

---

That sentence ran concurrently with a two to four year sentence for another criminal possession offense. Scott had two other convictions prior to his deportation hearing, one for grand larceny in the third degree at the age of sixteen, for which he had received five years' probation, and the other for unauthorized use of a vehicle for which he received three days community service. Id. As the Second Circuit noted, none of Scott's offenses were violent or drug related. Id. at 120.

15

The final considerations weighing against the grant of a waiver include other evidence of Russo's undesirability as a permanent resident. The record indicates that, after being convicted on the criminal possession charge in 1995, he failed to appear at sentencing. He surrendered himself several months later, after a bench warrant had been issued against him, and received an enhanced sentence of three to six years' imprisonment. Finally, Russo testified that he did not pay taxes on the income he earned as a driver, describing his employer's operation as a "cash business." Tr. at 33-34. Russo's failure to abide by the tax laws weighs against a finding that an IJ would have granted him relief in 1998.

Despite the substantial adverse factors analyzed above, Russo also had considerable favorable equities in 1998. First, he had family ties to the United States. His wife was an LPR, and his three United States citizen children were all minors at the time. Second, Russo had lived in the country as an LPR for a long duration, having arrived in the country at the age of seven. The court recognizes, however, that the strength of this equity is mitigated by the fact that Russo had spent much of his adult life in prison, having been incarcerated for over ten years at the time of his deportation hearing. Third, the court finds it particularly difficult to consider the hardship Russo's family would have suffered in 1998 upon Russo's deportation. While his family did not appear to testify on his behalf at the March 24, 2005 hearing, his wife and children did submit letters expressing their desire that he return to their lives. Defendant's Ex. E. The court finds that Russo is disadvantaged by the passage of time between April 1998 and March 2005, acknowledging that circumstances and relationships may have changed in the intervening period. The court is unable to ascertain to what extent his family would have testified on his behalf seven years ago and what hardship they would have suffered at that point. Fourth, that Russo served in

16

the United States Army is also an equity weighing in his favor, although its strength is tempered by the fact that he served only forty-five days before falling ill and receiving an honorable discharge. Fifth, Russo also has some work history weighing in his favor, although the record does not indicate whether his employment during the years he was not incarcerated could be characterized as "regular" or "extensive." Russo first worked at his father's restaurant, until his father sold the business and retired. He testified that, at the time of his original deportation proceeding in 1991, he worked for a printing company for approximately six to seven months. Tr. at 32-33. Russo further testified that, at the time he was convicted of the offense underlying his 1998 deportation order, he had been working, for an unspecified period of time, as a driver with a taxi or limousine service. Finally, Russo has presented some evidence of rehabilitation during his incarceration at Ulster Correctional Facility immediately prior to his deportation in 1998, attesting to his participation in various programs at the facility.

Even if the court considers Russo's criminal history to be serious, in light of the four convictions for violent offenses dating between 1977 and 1981 as well as his fifth felony conviction in 1995, it is clear that he also had unusual or outstanding equities in his favor in April 1998. The duration of his lawful residency in the United States, his family ties, and his military service, albeit limited, suffice to meet the threshold required of aliens who have committed serious offenses or who have extensive criminal histories. Matter of Edwards, 20 I. & N. Dec. at 196. The court's conclusion is supported by the testimony of respondent's expert witness, who stated that Russo "definitely" had such outstanding equities in 1998. Tr. at 108. The court thus finds that, in 1998, a hypothetical IJ would have considered Russo's application for relief notwithstanding his criminal history, insofar as his equities cleared the threshold.

17

Respondent's expert witness, the former IJ and BIA board member, opined that it was "extremely unlikely" that Russo would have been granted a section 212(c) waiver in 1998, specifying that he had, in her opinion, less than a 10% probability of receiving such relief. Tr. at 110. The witness testified that in her opinion, at the time he was granted a section 212(c) waiver in 1991, Russo had no more than a 20-30% probability of receiving such relief. Id. She further testified that, had she been a member of the BIA panel reviewing IJ Weisel's decision, she might have voted to reverse that grant of relief as an abuse of discretion.[6] Id. at 105-06. The witness went on to testify that Russo's chances of receiving relief were greatest at his first hearing, in 1991, because he would have been on notice of the immigration consequences of criminal convictions by the time of his second hearing in 1998. Id. at 110-11. Based on her testimony, it is clear that the witness believed that IJ Weisel had erroneously granted Russo relief in 1991 and that Russo's application would have been denied in 1998 largely because of the crimes he committed between 1977 and 1981 and for which he had received a waiver of deportation.

Having considered the adverse and favorable factors, the court concludes that its ruling on defendant's motion turns on the standard adopted by the Second Circuit for establishing prejudice. In Copeland, the court noted that it had "flirted with" a standard that would require a defendant-alien to establish only that he had a "plausible showing" for relief. 376 F.3d at 73.

---

[6]The court notes that the BIA apparently did not review IJs' discretionary rulings on applications for section 212(c) relief for abuse of discretion. Rather, when the BIA "engage[d] in a review of a discretionary determination by an immigration judge, [it] rel[ied] upon [its] own independent judgment in deciding the ultimate disposition of the case." Matter of Burbano, 20 I. & N. Dec. 872, 873 (BIA 1994). That standard of review has been described by the BIA as being "de novo." Matter of Soriano, 21 I. & N. Dec. 516, 528 (BIA 1996) ("Such waiver applications are individual and fact bound, and they are properly left to the exercise of discretion by Immigration Judges in individual cases, subject to the de novo review authority of this Board.").

While the court is confident that Russo has established a plausible showing for relief, considering the positive equities in his favor and the fact that he had already been granted relief once notwithstanding his convictions for violent offenses, the court finds the "reasonable probability" standard adopted by the Second Circuit to establish a higher burden that Russo has not met. See United States v. Aguirre-Tello, 353 F.3d 1199, 1208-09 (10th Cir. 2004) (en banc) (finding the "plausible grounds" standard, and its implication that an alien need only demonstrate that the IJ's conduct potentially affected the outcome of the proceedings, to require a lower quantum of proof than the "reasonable probability" standard).[7] Were the court vested with authority to make its own discretionary determination, the result may be different. Tasked with determining whether there is a reasonable probability that an IJ considering Russo's application for section 212(c) relief in 1998 would have granted such relief, however, the court is constrained to find that Russo has not carried his burden.[8] The court believes that an IJ in 1998 may have granted Russo relief.

---

[7]The Ninth Circuit has adopted the "plausible grounds" standard for establishing prejudice in this context. United States v. Jimenez-Marmolejo, 104 F.3d 1083, 1086 (9th Cir. 1996). Courts applying that standard have found a plausible claim for section 212(c) relief where the alien established residency of long duration, family ties to the United States, and work history, i.e., the existence of favorable or outstanding equities. See, e.g., id.; United States v. Saldivar-Vargas, 290 F.Supp.2d 1210, 1214-15 (S.D.Cal. 2003); United States v. Andrade-Partida, 110 F.Supp.2d 1260, 1267 (N.D.Cal. 2000).

[8]One court in this circuit recently suggested that courts should understand "reasonable probability" to mean "a probability of 20%–the approximate inverse of 'clear, unequivocal and convincing evidence'– . . .considering that deportation often has such serious consequences for the deportee and his or her family." Copeland, 2005 WL 1109441 at *9. The court reasoned that "[s]ince the defendant's constitutional rights have been violated he is entitled, it is submitted, to the most favorable band border–here, it is proposed, 20%." Id. at *10. The court concluded that "[r]equiring a petitioner to meet a burden greater than 20% to establish a 'reasonable probability' that he would have been granted section 212(c) relief would therefore seem unfair and unreasonable." Id. Central to the court's rationale was the fact that IJs exercise broad discretion in considering applications for section 212(c) relief and that the exercise of that discretion varies considerably from one IJ to another. This court shares the view that the "reasonable probability"

The court cannot conclude, however, in light of Russo's four convictions for violent offenses, although attenuated by 1998, and his conviction for a fifth felony after having already been granted a section 212(c) waiver, that there is a reasonable probability that he would have been granted such relief a second time. While some aliens undoubtedly have been granted such relief twice, the court cannot find that defendant's equities in 1998 so outweighed the adverse factors that the court could conclude that, had the IJ considered his eligibility for relief, there is a reasonable probability that such relief would have been granted. As noted above, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Scott, 394 F.3d at 118. While the IJ may have granted Russo relief, the probability that he would have done so is not sufficient to undermine confidence in the outcome.

Because Russo has not satisfied the prejudice component of section 1326(d)(3), the court need not reach the statute's other two requirements although, under the Second Circuit's ruling in Sosa, the exhaustion requirement would be excused in his case.

---

standard provides district courts with little guidance. This is so both because an alien bears "the burden of demonstrating that his application merits favorable consideration," Matter of Marin, 16 I. & N. Dec. at 583, while leaving the determination to the broad discretion of the IJ, and because of the paucity of published decisions of IJs and the BIA that would aid the court in its analysis. Following the Second Circuit's direction in Scott to consider what an IJ, correctly applying the law, would have done in the first instance, however, the court finds that it must only consider the equities as they existed at the time of the hearing, disregarding the nature of the instant proceedings and the fact that defendant's constitutional rights were violated. While the court is not prepared to opine as to the quantum of proof necessary to establish a "reasonable probability," the court understands defendant's burden to be not insubstantial, requiring more than a mere plausible claim for relief.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the indictment is denied.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: May 23, 2005
      Brooklyn, New York

SERVICE LIST:

Attorney for the United States
Sean Thomas Haran
U.S. Attorneys Office
Eastern District of New York
147 Pierrepont Plaza
Brooklyn, NY 11201

Margaret Kolbe
U.S. Attorneys Office
Eastern District of New York
147 Pierrepont Plaza
Brooklyn, NY 11201

Attorney for Defendant
Roger B. Adler
225 Broadway
Suite 1804
New York, NY 10007